AMERICAN WESTERN BONDING
COMPANY, INC., Plaintiff–
Respondent,

v.

UNITED SURETY AGENTS, INC. and
Far West Insurance Company,
Defendants–Appellants.

No. 25708.

Missouri Court of Appeals,
Southern District,
Division Two.

March 31, 2004.

Motion for Rehearing and Transfer
Denied April 22, 2004.

Application for Transfer Denied
June 22, 2004.

William J. Fleischaker, Joplin, for Appellant.

Brent Correll, Ron Mitchell, Joplin, for Respondent.

JEFFREY W. BATES, Judge.

United Surety Agents, Inc. ("United") appeals from a judgment awarding American Western Bonding Company, Inc. ("American") $73,983.41 in damages. The only issue presented by United's appeal is whether the trial court had jurisdiction to modify its original "judgment," which awarded American the value of a bank account under United's control, by adding language expressly stating the dollar amount of American's damages. We conclude that the document which the trial court denominated as its original "judgment" was, in fact, merely an interlocutory order subject to later revision. Accordingly, the trial court retained jurisdiction to later enter a final judgment which stated the specific sum the trial court awarded American as damages. It is this final judgment of the trial court which we affirm.

## I. Factual and Procedural History

American is a Missouri bail bonding company. In June 1996, American entered into a bail bond agreement with Far West Insurance Company ("Far West") and United.[1] Pursuant to this agreement, American was authorized to solicit and execute bail bonds in Missouri, Kansas, Oklahoma and Colorado on which American would be named as the principal and Far West would be named as the surety. The agreement required American to deal directly with Far West's exclusive agent, United. Any party could terminate the agreement at any time, with or without cause, by giving the other parties a written termination notice.

Each time a bond solicited by American was issued, the contract required American to pay United an additional one percent of the face amount of the bond. This money was placed by United in an indemnity fund. The purpose of this fund was to provide Far West with additional security for acting as the surety on American's bonds. If a bond executed by American was ultimately forfeited, the indemnity fund could be used to pay the face amount of the bond, in the event American failed to do so using either its own funds or the bond collateral. United kept American's indemnity fund in a segregated investment account bearing American's name at an Indiana bank. At United's direction, American's money was conservatively invested in a tax-free municipal bond fund. Although the account was in American's name, it could not move the account, change the method of investment or withdraw the money without United's permission.

In June 1997, Connie Morrison ("Morrison") was arrested in Indiana and held on criminal charges there. Her bond was set at $5,000. American was contacted by Tom and Missey Riley ("the Rileys"), who asked American to obtain a bail bond for Morrison so she could be released from jail.[2] The Rileys gave American a recreational vehicle as collateral for the bond. Because American was not authorized to issue bonds in Indiana, a "transfer bond" was required. At American's request, United contacted one of its Indiana agents, Shumucker, to act as the executing agent on the bond. Shumucker signed and posted the bond with the Indiana court, resulting in Morrison's release from jail. Shumucker then transferred responsibility for the bond back to the requesting agent, American. American executed a hold-harmless agreement in which it acknowledged that it assumed "any and all liability and responsibility" for Morrison's bond.

In March 1998, Morrison failed to appear in court. In October 1998, American gave written notice that it was terminating the bail bond agreement with United and Far West. While that notice terminated American's right to solicit and execute new bail bonds, the parties' rights and duties under the agreement continued as to all bonds previously issued by American that were still in effect, including the Morrison bond.

In March 1999, American released the recreational vehicle, which was the collateral for the Morrison bond, back to the

---

1. Far West is a California insurance company engaged in the business of serving as the corporate surety on bail bonds. United is an Indiana corporation with its headquarters located in Indianapolis. United acts as the managing general agent for a number of insurance companies, including Far West.

2. The Rileys were a husband and wife residing in Carthage, Missouri. The nature of their relationship with Morrison is not disclosed in the record.

Rileys. American did so because it mistakenly believed that the case against Morrison was over. American was not aware that Morrison had failed to appear in court. On June 3, 1999, an Indiana court issued a judgment forfeiting Morrison's bond and set July 22, 1999, as the deadline for paying the judgment. Prior to that date, the judgment was paid by United using $5,000 deducted from American's indemnity fund, as permitted by the bail bond agreement. Prompt payment was necessary to prevent Indiana from suspending the authority of Far West and United to issue bail bonds in that state.

In January 2000, American filed suit against United and Far West. American's lawsuit asserted two principal claims against United and Far West: (1) United should not have paid the judgment of forfeiture on the Morrison bond from American's indemnity fund because United's agent, Shumucker, knew Morrison did not appear at her hearing and thereafter failed to notify American of her nonappearance; and (2) United had breached its fiduciary duty to American by keeping its money and by maintaining that money in an account which was declining in value. United's position was that it had no obligation to return American's money in the indemnity fund as long as the lawsuit was pending.

The case was tried to the court on July 29, 2002. During the presentation of American's evidence, the trial court admitted in evidence statements which American had received showing the various monthly values of its indemnity fund account for the one-year period from November 1998 to November 1999. American had no statements for the years 2000 or 2001. American's vice-president, Carolyn Clay, testified that she sent United a certified letter on September 1, 2001, demanding the release of American's indemnity fund money.

Defendants' only witness was United's chief operating officer, Leslie Sebring. During Sebring's testimony, he made the following admissions relevant to this appeal: (1) United had received American's September 2001 demand letter; (2) United controlled the money in the indemnity account because the bank would not release American's money without United's permission; (3) American did not owe United any money from the account; (4) Sebring did not know the indemnity fund's current value because he had not brought American's account records with him to trial; and (5) United refused to give American its indemnity fund money unless American released its lawsuit against United in exchange for this payment.[3]

At the conclusion of the trial, the court took the matter under advisement and asked the attorneys to submit suggestions. On August 23, 2002, the trial court entered its original "judgment" in the case. In this document, the trial court made the following rulings: (1) the court denied American's claim that United improperly deducted $5,000 from the indemnity fund to pay the judgment of forfeiture on the Morrison bond; (2) the court denied American's claim that it was entitled to additional actual damages because United mismanaged the investment of American's money in the indemnity fund account; (3) the court denied American's request for punitive damages; and (4) the court grant-

---

**3.** On redirect examination, Sebring testified that American's indemnity fund money was not released because the bail bond agreement contained a provision concerning reimbursement of litigation expenses, and this matter was in dispute. Defendants, however, introduced no evidence that either of them had incurred any such expenses which should be reimbursed pursuant to this provision.

ed American's request that United be required to release the money being held in American's indemnity fund account. Accordingly, the trial court's "judgment" stated that "Plaintiff [shall] have judgment against Defendants under Count II for the value of the account being held by Defendants plus all accrued interest...."

On September 30, 2002, United withdrew all of the money in American's investment account. The account value on that date was $73,983.41. This sum was placed in an escrow account by United. Some time later, United sent a check in the amount of $68,480.21 directly to American. United had arrived at that figure by deducting $5,503.20 in litigation expenses from the escrow account and sending a check for the remaining account balance to American. United and American disagreed over whether the sum tendered by United represented "the value of the account" which the trial court had awarded American in the original "judgment."

On March 19, 2003, American filed a motion to amend the "judgment" *nunc pro tunc* or, in the alternative, to enter a final judgment. On March 21, 2003, the trial court entered a judgment *nunc pro tunc* in American's favor in the amount of $73,983.41. This entry was made without United being given notice or an opportunity to be heard on the matter.

On April 21, 2003, defendants filed a motion to vacate the judgment *nunc pro tunc*. The trial court conducted a hearing to address defendants' motion to vacate on April 28, 2003. During the hearing, the trial court concluded that the addition of a specific dollar amount of damages could not be added to the original "judgment" by a *nunc pro tunc* entry and that the record needed to be reopened for the presentation of additional evidence concerning the amount of money that was in American's indemnity fund account. Accordingly, the court sustained defendants' motion to vacate and scheduled another hearing on May 16, 2003.

The day before the scheduled hearing, defendants filed suggestions in which they argued that, if the judgment was not final, they were entitled to an award of litigation expenses out of American's indemnity fund account. At the May 16th hearing, the attorneys for American and United entered into two stipulations in lieu of presenting additional evidence: (1) the value of the account as of October 4, 2002, when United withdrew the money and placed it in escrow was $73,983.41; and (2) United had incurred $6,243.01 in litigation expenses, and it claimed these expenses should be repaid out of the escrow account pursuant to the reimbursement provision in the bail bond agreement. At the conclusion of the hearing, the trial court denied United's request for reimbursement and ordered American's counsel to prepare an "amended judgment" that stated the specific amount of money damages that had been awarded to American by the court.

On May 19, 2003, the trial court signed and filed its "amended judgment," which was identical in all material respects with the prior document except for the addition of the following language in the decretal portion of the judgment: "It is stipulated by the parties that the value of the account is $73,983.41 and Judgment is entered in favor of Plaintiff and against Defendant in the sum of $73,983.41...." United filed a timely notice of appeal from this judgment.

## II. Discussion and Decision

United's two points relied on present essentially one issue for us to decide: whether the document that the trial court signed and filed on August 23, 2002, was a final judgment. If so, United contends that the judgment could not be modified

nine months later to include a specific dollar amount of damages awarded to American either by a correction *nunc pro tunc* (Point I) or by entry of a new judgment (Point II).

In our view, United's first point presents nothing for us to review. The trial court did enter a judgment *nunc pro tunc* on March 21, 2003, that contained a specific dollar amount of damages, but this judgment entry was vacated on April 28, 2003, at United's request. Accordingly, there is no judgment *nunc pro tunc* in existence. The only two possible "judgments" that could exist in this case are the ones signed by the trial court on August 23, 2002, and May 19, 2003. Therefore, United's first point is denied as moot.

■ In United's second point, it contends that the "judgment" entered by the trial court on August 23, 2002, was final even though it failed to state the specific dollar amount of damages that were awarded to American. We disagree.

■ American's lawsuit against defendants sought actual and punitive damages based on various theories of recovery sounding in contract and tort. Thus, it was a conventional action to recover money damages. The trial court's "judgment" of August 23, 2002, granted American's request for damages, but it failed to specify the amount American was being awarded. Though denominated a "judgment," this document was too indefinite to be valid and enforceable:

> It is well established law that to be valid, a judgment must be susceptible of enforcement in the manner provided by law. It must be in such form that the clerk is able to issue an execution upon it which an officer will be able to execute. If it is a judgment for money, it must specify with definiteness and cer-

tainty the amount for which it is rendered.

*Gerard v. Kodner,* 468 S.W.2d 677, 681 (Mo.App.1971). If a money judgment does not state on its face the amount for which it is rendered, that sum must be ascertainable from the record to be enforceable by execution. *See Gardner v. Gardner,* 830 S.W.2d 559, 562 (Mo.App.1992). When the trial court signed and filed the so-called "judgment" on August 23, 2002, neither of these requirements was met. This document did not state the amount of damages awarded to American, and no proof had been presented at the trial from which that sum could be ascertained by examining the record. It was not until the hearing on May 16th that the trial court was first presented with proof, via stipulation, from which the actual amount of American's damages could be determined. Therefore, the trial court's "judgment" of August 23, 2002, was too indefinite to be final. *See Billingsley v. Ford Motor Co.,* 913 S.W.2d 137, 138 (Mo.App.1996) (trial court's failure to allocate a punitive damage award between two plaintiffs made the judgment too indefinite to be final); *Payne v. Payne,* 695 S.W.2d 494, 497–98 (Mo.App.1985) (a money judgment left blank as to amount is not a judgment and is interlocutory, even though it determines some rights of the parties). This document was merely an interlocutory order that could be revised until a true final judgment was entered. *See Norwine v. Norwine,* 75 S.W.3d 340, 344 n. 6 (Mo.App.2002); *Gould v. Rafaeli,* 822 S.W.2d 494, 494–95 (Mo.App.1991).

In reaching our conclusion, we have given due consideration to the arguments presented by United. We find each of them to be without merit.

United's first argument is that the August 23, 2002, "judgment" is final because American could bring a separate action (e.g., a declaratory judgment proceeding)

to determine what amount properly belonged in its indemnity account and then proceed to collect its money. United's argument runs afoul of the rule that, "[g]enerally, a final and appealable judgment disposes of all issues and all parties in the case leaving nothing for future determination." *Ackerson v. Runaway II, Inc.*, 961 S.W.2d 933, 934 (Mo.App.1998). The trial court's "judgment" of August 23, 2002, fails to meet this requirement. We do not believe that American is required to bring two lawsuits to obtain relief that was requested, and could properly be granted, by a final judgment in the instant case. We further note that United's argument ignores the principle that, to be valid and enforceable, a judgment must be in such form that execution may issue without requiring external proof and another hearing. *See Commerce Bank of Springfield v. Green*, 760 S.W.2d 602, 603 (Mo.App.1988).

United's second argument is that the trial court's "judgment" of August 23, 2002, is no more indefinite than similar judgments which have been held final in dissolution actions. The answer to this contention is found in *Krane v. Krane*, 912 S.W.2d 473 (Mo. banc 1995):

> Generally, the law requires that a decree or judgment for money, to be enforceable, must be definite and certain. Traditionally, if a trial court found it necessary to consider external evidence in order to ascertain the specific amounts due under the order, the order was deemed too indefinite to be enforced. This Court has relaxed the requirement of definiteness and certainty, however, in the context of dissolution orders and decrees.

*Id.* at 475 (citations omitted). While we acknowledge that a less rigorous rule of finality appears to be utilized in such cases, we believe this rule of necessity adopted by our Supreme Court applies only to dissolution cases.

In conclusion, we hold that the document signed and entered by the trial court August 23, 2002, was too indefinite to be final because it did not state with certainty the amount of money the trial court awarded American as damages. While this document decided virtually all of the issues in the case, it did so as an interlocutory order. Therefore, the trial court retained jurisdiction to review and revise this order until a final judgment was entered. That occurred on May 19, 2003, when the judge entered a judgment which stated with certainty the sum American was awarded as damages. Despite the nomenclature used by the trial court, this "amended judgment" of May 19, 2003, constitutes the first, and only, final judgment entered in this case.

Having decided the finality question, we are left to wonder what purpose was served by this appeal since United has not contested the trial court's decision to award American the account, disputed the account's dollar value, or appealed the denial of its request for litigation expenses. With due attribution to Tennyson, however, we must be content to observe that ours is "not to reason why," but to decide the issue presented to us.[4] Therefore, we affirm.

PARRISH, J., and RAHMEYER, C.J.–P.J., concur.

---

**4.** ALFRED LORD TENNYSON, *The Charge of the*    *Light Brigade, in* POEMS, II, 225–27 (Hallam

Lord Tennyson ed., LONDON: MACMILLAN 1908).